UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMETRA C. KAZANIS, D.D.S.,

      Plaintiff,

vs.                                                              Case No.

AMERITAS LIFE INSURANCE CORP.,              HON.

      Defendant.

_____

Troy W. Haney (P48614)
Haney Law Office, P.C.
Attorney for Plaintiff
330 East Fulton Street
Grand Rapids, MI 49503
Telephone:  616-235-2300
Facsimile:   616-459-0137
Email:  thaney@troyhaneylaw.com

_____

## **COMPLAINT**

Plaintiff, Demetra C. Kazanis, D.D.S., by her attorney, Troy W. Haney of Haney Law Office, P.C., and for her complaint against Defendant, Ameritas Life Insurance Corp., states as follows:

### **Parties**

1.  Plaintiff, Demetra C. Kazanis, D.D.S., is an adult and legally-competent individual who has resided in Northville, Michigan at all times relevant to this litigation.

2.     Defendant, Ameritas Life Insurance Corp., is an insurance corporation organized under the laws of the State of Nebraska, and whose headquarters and primary place of business is in Lincoln, Nebraska.

## Jurisdiction and Venue

3.     At all times relevant hereto, Defendant has been and is registered with the State of Michigan Department of Insurance and Financial Services ("DIFS"), and has regularly and systematically solicited and conducted business in the State of Michigan, thereby vesting this Court with authority to exercise personal jurisdiction over Defendant.

4.     As codified in 28 U.S.C. Section 1332, this Court has subject-matter jurisdiction over this litigation based on the diversity of citizenship between Plaintiff and Defendant.

5.     As the actions and/or omissions giving rise to Plaintiff's claims as recited herein occurred in this judicial district, venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. Section 1391(b).

## Factual Background

6.     The dispute giving rise to this litigation involves a Catastrophic Disability Rider that is part of a disability income insurance contract (hereafter "the Policy") between the parties, issued by Defendant directly to Plaintiff as an

individual, and bearing a date of issue of April 8, 2011 and policy number N00078596D.

7.     The Policy was purchased by Plaintiff as an individual, and not provided and paid for as an incident of her employment, and as such, it is a matter of private contract.

8.     The Plaintiff has continuously paid the premiums on the Policy since the date of issue and through a portion of 2017, and has therefore paid premiums for approximately 6 years.

9.     The Defendant has approved the Plaintiff for long term disability ("LTD") benefits based on her Total Disability, and the Plaintiff is currently collecting monthly LTD benefits from the Defendant.

10.    At issue in this case is the Catastrophic Disability Rider ("CDR") included as part of the Policy, and the Defendant's denial of Plaintiff's claim for CDR benefits.

11.    The CDR states in relevant part,

> **CATASTROPHIC   DISABILITY   AND   CATASTROPHICALLY DISABLED.** Means that, due to a *sickness or injury:*
>
> (1)   *You* are unable to perform two or more *activities of daily living* without *stand-by assistance* due to loss of functional capacity;
> * * *

**ACTIVITIES OF DAILY LIVING**

\* \* \*

(2)   <u>Toileting</u>: the ability, with or without the help of adaptive devices, to get to and from or on and off the toilet; and to perform associated personal hygiene.

(3)   <u>Transferring</u>: the ability to move in and out of a chair, bed, or wheelchair with or without equipment such as canes, quad canes, walkers, crutches or grab bars or other support devices including mechanical or motorized devices.

(4)   <u>Continence</u>: the ability to voluntarily control bowel and bladder function, or, in the event of incontinence, the ability to maintain a reasonable level of personal hygiene including caring for a catheter or colostomy bag.

\* \* \*

(6)   <u>Bathing</u>: the ability to wash yourself, with or without the help of adaptive devices, by sponge bath; or in the tub or shower, including the task of getting in and out of the tub or shower.

**STAND-BY ASSISTANCE.** Means *you* require the presence of another human being within arm's reach of *you* to prevent, by physical intervention or verbal cueing, *injury* to *you* while *you* are performing the *activities of daily living*.

(Emphasis in original).

12.   Plaintiff is a dentist with more than fifteen (15) years of experience, and who previously had 100% ownership of her dental practice, Demi C. Kazanis, DDS, PLLC, located in Royal Oak, Michigan.

13.   The Plaintiff's last day of work was on April 17, 2017 due to the following diagnosed medical conditions:

- Acute bilateral shoulder pain
- Chronic Fatigue Syndrome
- Chronic generalized pain
- Central Nervous System Demyelinating Disease
- Fibromyalgia
- Incontinence, bladder and bowel

4

- Irritable Bowel Syndrome
- Osteoarthritis of Sacroiliac Joints
- Psoriasis
- Severe low back pain
- Transverse Myelitis

14.   As a result of the Plaintiff's various medical conditions, she also experiences

a range of symptoms, including the following:

- Bloating
- Bruising
- Chronic, widespread pain
- Clumsiness
- Cognitive impairment (loss of time, thinking, judgment altered, irrational irritability, unstable moods)
- Confusion
- Constipation
- Decreased stamina
- Decreased strength
- Diplopia
- Dry eyes
- Edema
- Erythema of extremities
- Extreme fatigue
- Fibro fog
- Flatulence
- Gross weight gain
- Hand tremors
- Headaches
- Heat intolerance
- Impaired memory/memory loss
- Joint pain

- Peripheral neuropathy of extremities
- Physically unsteady
- Photophobia
- Severe diarrhea
- Shortness of breath
- Stomach pain
- Visual disturbances
- Visual acuity diminished

15.  On June 4, 2017, the Plaintiff completed a "Statement of Claim Application for Disability Benefits". Included as part of her claim application was an Attending Physician's Statement completed by Dr. Sabrina Qazi on June 1, 2017. Dr. Qazi's statement included in part,

> Patient needs standby assistance with bathing, toileting, incontinence (bowel and bladder). Patient needs domestic help with childcare, personal hygiene needs, shopping, and cooking. I recommend stand by assistance with transferring due to many previous accidents while unattended. I have informed her she should NOT be practicing dentistry or making financial decisions. I feel she will never be able to practice dentistry again. * * *
>
> Patient cannot work anymore in any capacity of being a dentist. Her diagnoses are irreversible and only palliative treatment with medications can be offered. Patient is retrogressing.
>
> (Emphasis in original).

16.  In mid-2017, Scott Young, a field representative for the Defendant visited the Plaintiff at her home and interviewed the Plaintiff as part of the Defendant's investigative process.

17.   On October 31, 2017, Mr. Young visited the Plaintiff a second time at her home to conduct another interview of the Plaintiff as part of the Defendant's continuing investigation of her claim.

18.   During this second visit, Mr. Young acted in a manner that was highly unprofessional and extremely inappropriate, especially considering the dynamic of power that Mr. Young held in relation to the Plaintiff, wherein the Plaintiff's CDR benefits would hinge on the content of Mr. Young's investigative report.

19.   On November 1, 2017, Jon Erdman, a Senior Claim Examiner for the Defendant, emailed the Plaintiff to inform her that, "*based on the information we have received, we have approved your claim for Total Disability effective April 17, 2017.*" However, while the approval of the LTD benefits had been decided, no decision had yet been made in regard to the CDR benefits.

20.   On November 26, 2017, the Plaintiff wrote a grievance letter to Mr. Erdman, in part to inquire about the CDR benefits, but also to complain of the inappropriate conduct exhibited by Mr. Young during his prior visit. The letter stated in part,

> Your field representative, Mr. Young, visited my house for a second time on October 31, 2017 asking very specifically about the [CDR] portion of my claim. Among other questions previously asked, he inquired where I obtained my medical supplies, which activities of daily living (ADL) were the basis for my claim and in what way these limited my life. At this time, I answered all his questions again, including a brief dialog pertaining to my sex life with my husband. Mr.

Young proceeded to ask about a man who answered my door earlier that day, he asked repeatedly if it was my husband and he asked if my husband was home at the current time. I responded to Mr. Young that my husband was not at home and only then Mr. Young asked why he could not come inside. I was sitting on my porch crying and upon getting to my feet, he extended his arms, said it was cold outside and he asked for "a hug". I declined two times until his insistence became overwhelming and he said, "We are both human beings with needs, right?". There are more unpleasant details, but I will not extrapolate upon them now. I am unaware of home visit protocol, but I cannot imagine this is how Ameritas wants its field representatives behaving. I felt extremely intimidated and vulnerable to say the least.

21.  Within days of the Plaintiff's letter, on December 1, 2017, Mr. Erdman issued a letter to the Plaintiff to inform her that "*as an act of good faith… we are providing Catastrophic Disability Rider benefits for the closed period of July 4, 2017 to October 31, 2017*". The letter also informed the Plaintiff that additional information was needed by the Defendant, and requested that the Plaintiff undergo an "Independent" Medical Examination.

22.  On November 1, 2017, the Defendant's "good-faith" payments of CDR benefits to the Plaintiff ended, and the Defendant discontinued this benefit to the Plaintiff.

23.  As of December 4, 2017, six (6) months had passed since the Plaintiff made her initial claim for CDR benefits, and the Defendant had not yet reached an official decision on the Plaintiff's claim.

24.  On February 5, 2018, Dan Hepner, a new field investigator for the Defendant, visited the Plaintiff at her home to conduct a third field-interview.

25.  On March 9, 2018 the undersigned submitted a letter in support of the Plaintiff's claim for CDR benefits, including an Attending Physician Statement from Dr. Sabrina Qazi dated March 5, 2018, and which stated in part,

> Dr. Kazanis relies on the use of incontinence garments for bowel and bladder voiding. She needs toileting assistance due to physical restrictions. * * *
>
> Patient now lives with her father a minimum of five days a week… Her father drives her to and from all appointments, daily activities, her father accompanies her for shopping.* * *
>
> Dr. Kazanis needs standby assistance with bathing, all toileting activities including bowel and bladder. She uses pads and diapers. She needs standby assistance with bathing and transferring due to many previous accidents although she still uses shower and transferring aids. She requires domestic help with childcare and child transferring. She needs help with her personal hygiene needs, shopping, cooking, and meal prep.

26.  The March 9, 2018 letter also included a Physician Statement of Disability from Dr. Qazi, dated March 5, 2018, and stated in part,

> …Dr. Kazanis has difficulties with the activities of daily living, cannot lift greater than 3-4 pounds; can only stand and/or sit for 5-15 minutes at a time; cannot bend, stoop, squat. She also uses a cane to assist her when walking as well as needs assistance when using the bathroom.

27.  On March 16, 2018, the Plaintiff attended an "Independent" Medical Examination ("IME") with Dr. Peter Samet.

28.  The report issued by Dr. Samet was not supportive of the Plaintiff's claim, and therefore on April 17, 2018, the Defendant requested for Dr. Qazi to review and respond to Dr. Samet's report.

29.    On April 17, 2018 the Defendant issued a letter to the Plaintiff informing her of Dr. Samet's unfavorable IME report, stating that the review of her claim for CDR benefits was still under review, and requesting that the Plaintiff undergo a second IME.

30.    On May 11, 2018, Dr. Qazi issued a response to Dr. Samet's IME report, and which stated in part,

> -. To be clear, I disagree with Dr. Samet's findings and, to be honest, find them to be incredibly presumptuous if not outright result driven.
>
> As you are aware, I am Demetra Kazanis' Rheumatologist and have provided medical care and treatment for a number of years. As such, I have had extensive opportunities to observe her in a clinical setting, which is well documented in her chart. As you are also no doubt aware, a consistent clinical presentation over time correlating with clinical findings can be a powerful diagnostic tool objectively confirming otherwise subjective conditions such as pain. Further, Dr. Kazanis has a number of disabling medical conditions, which have been confirmed by diagnostic measures both subjective and objective. * * *
>
> Dr. Samet saw Dr. Kazanis on only one occasion on behalf of an insurance company, as I understand. Therefore, it is difficult to imagine that Dr. Samet has the requisite foundation to judge her level of pain and even harder to understand why he would ignore objective diagnostic findings on MRI and xray unless it is being done to arrive at a desired conclusion regardless of truth. I have personally examined and talked with Dr. Kazanis during office visits. My medical opinion has not changed. Dr. Kazanis is permanently disabled from her occupational duties as a dentist and, for the foreseeable future, is unable to return to any other full time work.
>
> I have also advised Ameritas that Dr. Kazanis continues to require standby assistance with bathing, toileting, incontinence (bowel and bladder). Dr. Kazanis continues to need domestic help with childcare, personal hygiene needs, shopping, and cooking.
>
> I have recommended standby assistance with transferring due to many previous accidents. I have informed Dr. Kazanis that she

should not be practicing dentistry nor making financial decisions. Again, my opinion has not changed.

31. On May 23, 2018 the Plaintiff attended a second IME with Dr. Lewis Rosenbaum. Although Dr. Rosenbaum was supportive of the Plaintiff's claim for Total Disability from her career as a dentist, he was not supportive of the Plaintiff's claim regarding her inability to perform certain activities of daily living. Dr. Rosebaum's report was also forwarded to the Plaintiff's physician, Dr. Qazi, for an opportunity to respond.

32. As of June 4, 2018, one (1) year had passed since the Plaintiff made her initial claim for CDR benefits, and the Defendant had still not yet reached an official decision on the Plaintiff's claim.

33. On August 21, 2018, Dr. Qazi issued a response to Dr. Rosenbaum's IME report, and which she stated in part,

> I disagree with Dr. Rosenbaum's findings. * * *
>
> As a conscientious physician, I have learned to appreciate the value of a consistent clinical presentation over time correlating with clinical observations as a powerful diagnostic tool objectively confirming otherwise subjective conditions such as pain. Dr. Kazanis has a number of disabling medical conditions, which have been confirmed by diagnostic measures both subjective and objective. * * *
>
> Dr. Rosenbaum saw Dr. Kazanis on only one occasion on behalf of an insurance company, as I understand. As with your other hand-picked doctor, it is difficult to imagine that Dr. Rosenbaum has the requisite foundation to judge her level of pain and even harder to understand why he would ignore objective diagnostic findings on MRI and xray unless it is being done to arrive at a desired conclusion regardless of truth. * * *

> I have also advised Ameritas that Dr. Kazanis continues to require standby assistance with bathing, toileting, incontinence (bowel and bladder). Dr. Kazanis continues to need domestic help with childcare, personal hygiene needs, shopping, and cooking.

34. On November 29, 2018 the Defendant sent correspondence to Dr. Qazi, confirming their receipt of her letters and noting that she disagreed with the findings of Dr. Samet and Dr. Rosenbaum. The letter also summarized the Plaintiff's medical records, and provided the Defendant's opinion that the records were not supportive of the Plaintiff's claim to be impaired from certain activities of daily living. In a shameless attempt to create a false narrative that Dr. Qazi had reversed her opinion about the Plaintiff, the letter concluded by stating that, "*If we do not hear from you by December 20, 2018 we will assume you agree with our findings that Dr. Kazanis does not meet the criteria for catastrophic disability benefits.*"

35. As of December 4, 2018, eighteen (18) months had passed since the Plaintiff made her initial claim for CDR benefits, and the Defendant had still not yet reached an official decision on the Plaintiff's claim.

36. On January 3, 2019, the Defendant notified the Plaintiff that it intended to deny the Plaintiff's claim for CDR benefits. The letter stated in part,

> Based on the information provided throughout the course of our evaluation it does not appear Dr. Kazanis meets the definition of Catastrophically Disabled… it is our intent to deny Catastrophic Disability Benefits beyond October 31, 2017. If Dr. Kazanis has additional information she would like us to consider please submit it to our office...

37.  On March 11, 2019 the undersigned submitted a letter responding to the issues raised by the Defendant in its November 29, 2018 correspondence to Dr. Qazi, as well as further documentation in support of the Plaintiff's claim for CDR benefits. Included as part of the documentation submitted was an Attending Physician Statement from Dr. Sabrina Qazi dated February 22, 2019, and which stated in part,

> I do not know how many times and in how many different ways I can express to Ameritas it is my medical opinion as Dr. Kazanis' Rheumatologist:
>
> - That Dr. Kazanis is permanently disabled from her occupational duties as a dentist and, for the foreseeable future, is unable to return to any other full time work.
>
> - That Dr. Kazanis continues to require standby assistance with bathing, toileting, incontinence (bowel and bladder).
>
> - That Dr. Kazanis continues to need domestic help with childcare, personal hygiene needs, shopping, and cooking.
>
> - That I continue to recommend standby assistance with transferring due to many previous accidents.
>
> - That I have informed Dr. Kazanis that she should not be practicing dentistry nor making financial decisions.
>
> - That Dr. Kazanis's medical conditions are irreversible and only palliative treatment with medications can be offered.
>
> - THAT I DO NOT AGREE WITH AMERITAS' OPINIONS that Dr. Kazanis does not meet the definition of disability under the Catastrophic Disability Rider.
>
> - THAT I DO NOT AGREE WITH DR. PETER SAMET'S OPINION that Dr. Kazanis does not meet the definition of disability under the Catastrophic Disability Rider.
>
> - THAT I DO NOT AGREE WITH DR. LEWIS ROSENBAUM'S OPINION that Dr. Kazanis does not meet the definition of disability under the Catastrophic Disability Rider.

(Emphasis in original).

38.   Also included with the documentation sent on March 11, 2019 was a

Neuropsychological Evaluation completed by Dr. Renee Applebaum on

February 25, 2019, and which stated in part,

> Results of the current testing are deemed valid and reliable. There is no indication of exaggeration or feigning of deficits. – Working memory is an area of particular weakness. * * *
>
> Dr. Kazanis' performance is otherwise noteworthy for the following:
>
> 1.   Abnormality is noted in attention. Auditory sustained/selective attention falls in the Low Average range… Her visual working memory falls in the Low Average range. Dr. Kazanis' performance on the CPT-2 was noteworthy for inattention and impulsivity.
>
> 2.   Abnormality is noted in her performance on measures of expressive language… phonemic and semantic associative fluency fall in the mildly impaired range.
>
> 3.   Routine problem solving is mildly impaired. She demonstrates Low Average mental flexibility. Her performance on the Wisconsin Card Sort Test, a measure of higher level reasoning and concept formation, falls in the Low Average range, which is below expectancy given her intellectual capabilities. -.
>
> 4.   Motor impairment is noted including impaired motor speed and strength of grip bilaterally. -.
>
> 5.   Dr. Kazanis performs variably on measures of memory. -.
>
> 6.   Dr. Kazanis performs variably on measures of visual spatial functions… Her clock drawing is inaccurate with repetition of numbers and her hands being disproportionate although she performs normally on less structured visual constructional tasks. Visual analytical abilities fall in the Low Average range. * * *
>
> In Summary, Dr. Kazanis is predicted to have functioned in the Above Average range intellectually on a lifelong basis although it appears that there is subtle departure from the capabilities… Working memory is an area of relative weakness. There are very subtle signs of executive dysfunction. She exhibits unexpected

abnormality on measures of expressive language and variability in her visual constructional abilities. * * *

With respect to etiology, there is evidence for mental inefficiency and diffuse neuropsychological impairment commonly seen with fibromyalgia and chronic fatigue syndrome. * * *

Based upon this evaluation, I offer the following diagnosis for Dr. Kazanis:

1. Attention Deficit Hyperactivity Disorder, Primarily Inattentive Type, by History.
2. Unspecified Mood Disorder.
3. Cognitive Deficits Associated with Fibromyalgia and Chronic Fatigue Syndrome. * * *

Dr. Kazanis is considered disabled from employment from a neuropsychological standpoint.

39.    In April of 2019, the Defendant sent another representative, Mary Van Gordon, to conduct a fourth in-person interview of the Plaintiff, as well as an assessment of the Plaintiff's ability to engage in activities of daily living.

40.    On April 18, 2019 the Plaintiff underwent a Vocational Rehabilitation Evaluation with Dr. Robert Ancell. In his report, Dr. Ancell stated in part,

Her symptoms continue to be fatigue, pain and memory issues. She is a fall risk. She is incontinent. She uses a walker and a cane. She has grab bars in the bathroom. She has a home health aide 4 to 5 hours per week to assist with bathing and other tasks around the house. Her memory is worse and so is her fatigue.

She is unable to work. She needs help with cooking, cleaning, and laundry. * * *

A review of the criteria for Catastrophic Disability requires meeting at least two (2) activities of daily living. According to the treating doctors she meets Continence and Transferring and Bathing.

> From a vocational rehabilitation and case management standpoint
> Dr. Kazanis is totally unemployable and meets at least three (3)
> criteria for eligibility for Catastrophic Disability definition.

41.     As of June 4, 2018, two (2) years had passed since the Plaintiff made her initial

claim for CDR benefits, and the Defendant had still not yet reached an official

decision on the Plaintiff's claim.

42.     On July 15, 2019 the undersigned submitted a set of three (3) color

photographs to the Defendant, showing multiple cuts and bruises the Plaintiff

had received from a recent fall, including severe bruising on both arms, both

legs, and a cut on the Plaintiff's lower lip.

43.     On September 16, 2019, and now more than twenty-seven (27) months after

the Plaintiff's initial claim for CDR benefits, the Defendant issued a letter to

the Plaintiff to inform her that her CDR benefits were being denied. The letter

was inexplicably brief, void of any detailed explanation for the Defendant's

final decision, and simply stated,

> Thank you for your patience while we obtained additional information from
> Dr. Kazanis's physicians to assist us in our determination as to whether
> she meets the definition of catastrophic disability as defined by her policy.
>
> Based on the information received to date, we are upholding our denial of
> benefits under the Catastrophic Disability Rider attached to her policy.

44.     The September 16, 2019 denial letter was represented as the conclusion of any

administrative rights the Plaintiff might have under the Policy, leaving her

with no further option in this regard other than instituting the present litigation.

## Count I -- Breach of Contract

45.   Plaintiff incorporates by reference paragraphs 1 through 44 above, as if fully set forth herein.

46.   The Policy and the CDR are legally-binding written contracts between the parties and are supported by all of the necessary elements for a contract, i.e., offer, acceptance, mutual assent, and consideration.

47.   Plaintiff has not breached the subject contracts, and has performed all of her duties thereunder, including years of full payments of all due premiums on the Policy for the benefits that Defendant is now unjustifiably denying.

48.   The Plaintiff is undeniably disabled and is unable to engage in multiple activities of daily living without standby assistance.

49.   By refusing to honor the referenced terms and definitions of the contracts, Defendant has materially breached its contracts with Plaintiff, with the direct and proximate result that the Plaintiff has and will suffer actual pecuniary loss far in excess of the jurisdictional minimum of this Court.

50.   Plaintiff is due unpaid CDR benefits for the period starting from November 1, 2017 and going through October 31, 2019, and therefore Defendant owes unpaid CDR benefits in the amount of One-Hundred and Forty-One

Thousand, Three-Hundred and Sixty, and 00/100 ($141,360.00), not inclusive of interest.

51.     Presuming the Plaintiff's Total Disability status and inability to engage in multiple activities of daily living continues, starting on November 1, 2019, Defendant will owe Plaintiff an additional Five-Thousand, Eight-Hundred and Ninety, and 00/100 ($5,890.00) per month, the agreed upon monthly benefit in the Plaintiff's Catastrophic Disability Rider.

## **Prayer for Relief**

WHEREFORE, Plaintiff Demetra C. Kazanis, D.D.S., respectfully prays for:

(A)     A judgment in her favor against Defendant in the appropriate amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to redress Defendant's material breaches of the contract between the parties.

(B)     An accounting from Defendant, as to the Plaintiff's available benefits under the Policy and CDR, and the maximum period of time those benefits are potentially available to her under the Policy and CDR.

(C)     An Order instructing Defendant to file, in proper bates-numbered form, a copy of the Policy, the CDR, and all documents constituting the Plaintiff's claim file with Defendant in order to constitute the settled administrative or claim file record in this proceeding.

(D)     A declaratory judgment resolving any collateral issues that might be invoked by the pleadings and/or discovery in this litigation.

(E)     An award of interest, costs and attorney fees as consistent with applicable law, and for such other and further relief that comports with substantial justice and fundamental equity.

Dated:  October 30, 2019

*/s/ Troy W. Haney*
Troy W. Haney (P48614)
Haney Law Office, P.C.
Attorney for Plaintiff
330 East Fulton Street
Grand Rapids, MI 49503